SARTAIN, Judge.
The accident giving rise to this litigation occurred at approximately 1:30 p. m. on July 17, 1963. The plaintiff was employed as a journeyman electrician by American Electrical Company, Inc., a subcontractor of Crawford & Russell, Inc., who had undertaken to construct a synthetic rubber unit for the U. S. Rubber Company at its plant site at Geismar, Ascension Parish, Louisiana. Floyd C. Carbar, an employee of Crawford & Russell, was operating a 22-B model Bucyrus Erie crane when the boom collapsed, falling on plaintiff and seriously injuring him. The crane was rented from AAA Contracting Company, Inc.
Plaintiff sued Carbar, Crawford & Russell, and its liability insurer, The Travelers Insurance Company; AAA Contracting Company, Inc., and its insurer, Marquette Casualty Company; Bucyrus Erie, the manufacturer of the machine, who in turn third partied Peerless Insurance Company, the reinsurer of the now defunct Marquette Casualty Company. Bucyrus Erie also third partied Hartford Accident and Indemnity Company, general liability insurer of Baton Rouge Equipment Company, Inc., AAA’s vendor; and, Yaun Manufacturing Company, Inc., who allegedly manufactured a jib boom for the crane. Maryland Casualty Insurance Company, the compensation carrier for plaintiff’s employer, intervened seeking to recover the sums it expended as workmen’s compensation benefits in behalf of plaintiff. Various motions and exceptions were filed. Crawford & Russell and Travelers were dismissed as to tort liability to plaintiff; however, in view of an allegation that Travelers owed a separate obligation to inspect the machinery of Crawford & Russell for safety purposes, their independent motion for summary judgment was denied.
Yaun Manufacturing Company, Inc. and Hartford Accident and Indemnity Company were also dismissed on motions for summary judgment. The remaining motions and exceptions heretofore undisposed were referred to the merits.
Plaintiff appeals from a judgment rejecting his demands in toto. Travelers alone has answered the appeal and contends that the trial judge erred in not sustaining its motion for summary judgment. We reverse that portion of the judgment rejecting plaintiff’s demands as against Floyd C. Carbar. In all other respects we affirm.
The 22-B crane was placed on wooden mats and had been used to lift a concrete *10 bucket for the purpose of pouring a floor. After this work had been completed, the crane was moved back and the operator and certain ironworkers were in the process of lifting the mats to stack them in another place.
Plaintiff was in a ditch and engaged in connecting an electrical power line to a unit situated near the crane.
The evidence is clear that the hoist line was secured to the first mat and the line was drawn “taut”. It was at this moment that the ironworker was to step off the mat and signal the operator, Carbar, to lift it. Before the full weight of the mat was borne by the crane, the boom commenced to fail and buckle at the forward end of the butt section falling leftward at an angle of approximately 90 degrees from the place of the failure.
Plaintiff, in his initial petition, averred that he did not know the exact nature or cause of the accident and therefore urged the application of the doctrine of res ipsa loquitur. Alternatively, plaintiff alleged on information and belief that the crane was defective in that the “boom stops” were improperly constructed or braces thereon placed in such a manner as to prohibit the proper function thereof; that the operator, Floyd C. Carbar, in the use and operation of the crane caused the boom to be pulled too tightly against the arms thereof, with the resulting stress and strain thereon causing the boom to bend and collapse; that AAA Contracting Company, Inc. was negligent in improperly installing the boom stops and/or supplying Crawford & Russell with a defective crane; that agents of Crawford & Russell and AAA Contracting Company, Inc. had knowledge of the defective condition of the crane and permitted its continued use. In a supplemental petition plaintiff alleged individual negligence on the part of agents, servants or employees of The Travelers Insurance Company in failing to inspect the crane involved. Petitioner further sought relief from Bucyrus Erie Company as the manufacturer of the crane, alleging that the failure of the boom may have been caused by metal fatigue or defective material used in the construction, manufacturing and assembling of the crane and such additional factors as failure to properly instruct the owners and persons using the crane as to its load capacity, or its boom weaknesses, and longevity of use.
The thrust of all defendants’ arguments, save Carbar, is that the failure of the boom was occasioned by either one or both of the following factors, that the boom itself was defective or that the operator elevated the boom to the extent that it pressed against the boom stops with such force that the boom collapsed.
The 22-B model crane consists of a total boom of seventy feet. The section nearest the cab is fifteen feet in length and is referred to as the lower or butt section. Attached to it is another section measuring fifty-five feet. At the top of the forward end of the boom is a jib boom approximately twenty feet in length. The control cab and machinery are mounted on a chassis which is situated on crawler (track-type) wheels for locomotion purposes.
The boom is raised and lowered by a series of cables running from drums located in the cab. To obtain maximum lifting capacity, the boom itself is raised as high as possible. The hoist line then drops from the top of the boom and the object to be lifted is “hooked-up” and is raised or lowered by the reeling in or letting out of the line on drums also located in the cab. The boom itself is not moved to raise or lower an object. The drums for both the boom and hoist lines are controlled by hand operated levers.
The boom itself consists of four two and one-half inch angle irons (cords) arranged in rectangular form and connected by a series of flat irons forming a sort of lattice work. The cords are referred to as the top left and right or lower left and right cords as the operator would face them from his cab.
*11 In the instant case two boom stops were used. One attached to the upper left cord and another to the upper right cord, both extending back to and secured on the top of the cab. These boom stops are nothing more than telescoping pipes. They are placed on most booms or cranes for safety reasons. Without them, it is possible to elevate the boom to a vertical position in which case the boom itself would fall back over the cab. Further, if a hoist line breaks during a heavy lift, it suddenly releases the boom from heavy tension, causing it to spring back, with the possibility of also falling back over the cab. The boom stops in use at the time of the accident were installed by AAA Contracting Company shortly before the crane was rented to Crawford & Russell. They were approximately eleven feet in length when unextended. It is virtually conceded by all that they were of sufficient strength to cause the boom to fail first in the event continued pressure was applied to elevate the boom.
Mr. Carbar testified that on the morning of the accident he observed a small bow or bend in the upper left cord just forward of the lug attachment of the left boom stop. He called this to the attention of his immediate superior, Mr. Edmonston. To the best of his recollection, Edmonston contacted a Mr. Guillory, AAA Contracting Company’s heavy equipment foreman. His purpose in doing so was to relieve himself of any liability as to damage to the boom while it was in his care. He was told by Mr. Edmonston to proceed with the use of the machine. During the early part of the day the machine was used to lift a tank weighing 9300 pounds and, as previously noted, to lift concrete buckets, which when loaded, weighed 3500 pounds.
When the concrete was being poured the crane was resting on wooden mats to give it stability. It was then moved back and the mats were to be stacked in another location. He explained that the ironworkers had “hooked up” the first mat and he had tightened the line to where there was approximately one thousand pounds of pressure on it. Then he noticed that the boom itself was beginning to buckle and fall to the left. All he was able to do was to jump from the cab, though he did see the forward end of the boom strike plaintiff as it hit the ground. He emphatically denies that the boom was up against the stops or that he told anyone after the accident that he had elevated the boom to that extent.
Smithhart was unable to recall any of the events leading up to the accident.
The only other eye witness who testified did so by deposition. He was' James R. Lancaster, Project Superintendent for Crawford & Russell. This witness deposed that as he was walking from his field of-, fice to the vicinity of the crane he noticed that the boom was right up against the stops. This gave him great concern. As he approached the crane, he heard a loud report similar to a rifle shot and he then commenced running towards the machine. His principal concern was to warn other workers of the danger. He observed that Carbar’s right hand was on the boom hoist lever and that when Carbar jumped, the lever was still engaged. He explained that one of the reasons the boom fell to the left was because of the continued pull from the boom hoist line. He and other persons actually lifted the boom enough to extricate Smithhart.
Plaintiff strenuously objected to the introduction of this witness’s deposition into the record because Carbar, one of the co-defendants, did not receive notice of its taking and, consequently, was not present. Carbar was not represented by counsel during the trial but was present in proper person. His interest did not go unprotected because plaintiff’s principal targets were AAA Contracting Company, Inc. and Bu-cyrus-Erie and its insurer. The record emphasizes the extent to which plaintiff’s endeavors were directed to proving these latter defendants liable. When the objection was made by plaintiff to the introduction of Lancaster’s deposition, the trial *12 judge laid the matter over for sixty days to permit plaintiff to obtain rebuttal testimony. This same opportunity was available to Carbar. The trial judge recounted the numerous delays incurred during the existence of this litigation at the trial level, and in the exercise of his discretion concluded that the deposition should be admitted subject to the aforementioned opportunity given to plaintiff. Under these circumstances we do not consider the deposition inadmissible, particularly as it relates to plaintiffs claim because plaintiff’s counsel was present at the time it was taken, cross-examined the witness extensively and was given sixty days to rebut Mr. Lancaster’s testimony. It is our view that plaintiff is interposing an objection that is purely personal to the defendant, Carbar. The only alternative we have is to remand the matter for the limited purpose of permitting Carbar alone the opportunity to cross-examine Mr. Lancaster. He has already categorically denied Lancaster’s version of the incident and we have carefully considered the contradictions in their respective testimony. Even if we were to limit the probative effect of the deposition as to plaintiff’s claim alone, and not consider it as to Carbar’s position, the result reached by us remains unchanged.
Mr. Murphy H. Edmonston, a master mechanic and heavy equipment foreman for Crawford & Russell, stated that when Carbar called his attention to the bow or bend in the boom at sometime between 8:00 and 9:00 A.M. on the morning of the accident, he called Leroy Guillory to confirm that neither Carbar nor Crawford & Russell would be held accountable for the damage to the boom. He conceded that this was the only reason for calling Guillo-ry and that he (Edmonston) did not consider the boom unsafe or dangerous. He acknowledged telling Carbar to proceed. Mr. Edmonston has twenty-one years experience as a heavy equipment operator.
Mr. Guillory verified being called by Ed-monston to look at the boom. He was not asked whether he considered the boom safe or unsafe but he did state that he left the continued use of the machine to Edmon-ston’s judgment. Considering the aforementioned testimony of Edmonston, it is clear that the possible impairment of the boom was not mentioned or considered.
Four experts testified and we shall briefly state their conclusions. Mr. Alfred G. Rayner, called by AAA Contracting Company, Inc., observed the crane before it had been moved. He rated its lift capacity at 10,000 pounds with a maximum boom angle of 78 degrees. He described the mats as being four feet wide, ten inches thick, twenty-two feet long and weighing approximately 3500 pounds. The center of the mat that was to be moved was thirty-five to thirty-eight feet from the front end of the cab. Considering these observations together with the knowledge that the crane had successfully lifted objects of 9300 and 3500 pounds consistently that morning without incident, he concluded that the failure was caused by the boom hitting the stops, which it would do on reaching a boom angle of 70 degrees. His reason for reaching such a conclusion was based on the fact that the load to be lifted was not excessive, the drums and cables inspected by him were in excellent condition, the failure of the boom occurred where the left boom stop is connected to the top left cord and from the observation that an operator can boom up to the stops without knowing it.
Mr. Ralph Eglsaer was called by Bucy-rus-Erie. He was accepted as an expert in the field of mechanical engineering. Although he did not have an opportunity to examine the particular boom that failed, he was shown numerous photographs of it. It was his opinion that the failure was caused by the “pulling of the boom against the boom stops”. He further acknowledged, however, that the damaged left cord could have weakened the boom and caused it to fail.
Dr. Oscar W. Albritton was also called on behalf of Bucyrus-Erie. He opined that there were only two reasons for the *13 boom to have failed, either from picking up an excessive load or from the boom coming into contact with the boom stops. He ruled out the first cause by stating that the mat was not lifted and the failure of the boom was to the left rather than downwards towards the load. Further, the bend in the left cord was described by others as a “cup” bend, with the edges facing upwards which indicated to him that something must have struck the cord from the top. If it was a weight created bend the “cup” would have been facing downwards. He reasoned that the boom fell to the left because the boom came up against the right boom stop first and under pressure yielded to the weaker left side.
Dr. Louis J. Capozzoli, Jr. was called as an expert witness on behalf of Crawford & Russell and Travelers. His qualifications were outstanding. He holds a Doctor’s degree from M.I.T. in Structural Engineering and is a practicing consultant, licensed in six states. He examined the crane and the collapsed boom on the day following the accident, but before it had been moved. He described the failure as follows: “The crippling of metal, the major crippling of metal, major distortion and breakage, was all at the point where the boom-stops join the boom, the boom-stops hit the boom.” The forward portion of the boom had fallen at an angle of 80 to 90 degrees to the left of the remaining section indicating to him that the top left cord member failed first. Like the previous experts, he was of the opinion that it was not a weight or lift occasioned failure because the force of gravity would have caused the forward section of the boom to fall towards the load or straight down. Based on his observations of the wreckage alone and without actually witnessing the incident, he would not categorically assign any particular reason for the failure. However, he was posed the following hypothetical question and answered thusly:
“Q. Dr., if we assume that there was a noticeable bend in the upper left cord of this crane on the morning that the accident occurred, and if we assume that that crane had been used that day to lift a fairly heavy load, a tank weighing maybe four tons or maybe five tons, and had lifted buckets of concrete, and that the crane operator had no difficulty through those operations, but that that crane boom failed under practically no load, only the slack removing tension, at a time when the only different factor that occurred was the raising of the boom up against the boom-stops, would it be your opinion that the hitting of the boom-stops with the boom caused the failure and the collapse of the boom ?
A. Yes, sir.”
Considering the aforementioned testimony, lay and expert, the trial judge in his written reasons for judgment stated:
“The testimony herein shows without dispute that just prior to the accident a bow or bend was observed in the left hand angle iron of the lower member of the boom with a depression about the size of a cup near the center of the bend located in the area where the boom would come into contact with the boom stops. The boom with its jib extension measured some 75 feet. The crane was located a distance of some 25 feet from the mat to be lifted. To make this lift it was necessary for the operator to ‘boom up’ in an almost vertical position. After considering the physical evidence and the testimony of the witnesses, the Court concludes that the bend in the angle iron with its cup-like, depression caused the boom to come in contact with the boom stops unevenly. The unbent angle iron would naturally come into contact with its boom stop before the lefthand member reached its stop. Because of the nearness of the crane to the object to be lifted it was necessary for the operator to ‘boom up’ at a broad angle which brought the boom into contact with the stops. Since the right hand member *14 came into contact with the stop before the left-hand, a twisting motion or force was imparted to the boom which caused the collapse. Before making the lift we observe that Mr. Carber, the operator, called the defect in the boom to the attention of his immediate superior, Mr. Edmonston, master mechanic, and it was decided by him to continue with the operation. This mistake in judgment under the circumstances, in our opinion, constitutes actionable negligence which was the direct proximate cause of the accident. Since Mr. Edmonston was an employee of Crawford & Russell, Inc. his negligence in the operation of this defective crane is imputable to his employer, Crawford & Russell, Inc.
“As heretofore shown Crawford & Russell, Inc. was the prime contractor and as such under the provisions of the workmens compensation law was the statutory employer of the plaintiff who was an employee of the sub-contractor, American Electrical Company, Inc. The liability of the statutory employer is limited to workmen’s compensation and the liability of its insurance carrier is secondary to the liability of the compensation carrier of the sub-contractor, by whom the injured employee was employed. Hebert v. Blankenship vs. British-American Oil Producing Company [La.App.] 187 So.2d 798; Sisk v. L. W. Eaton Co., [La.App.] 89 So.2d 425.
“The testimony herein does not sustain the position of the plaintiff that the defect was present in the boom when the crane was leased by AAA Contracting Company to Crawford & Russell, Inc. Mr. Holcombe, a master mechanic, employed by AAA at the time of the accident testified that there were no bends or defects when the crane was turned over to Lessee. No defects were reported to the lessor by the lessee. However, even if the defect existed, it was noticed by Mr. Carber and Mr. Edmonston prior to the accident and its possible effect upon the operation was considered. This knowledge coupled with the decision to continue the operation had the effect of excusing the lessor by making his negligence a remote cause of the injury. A lessor is not liable for a defect in the thing leased if the defect is discovered prior to the accident. Friedieu [Fredieu] v. City of Winnfield [La.App.], 180 So.2d 48; Estill v. Hanover Insurance Company, La. [App.] 209 So.2d 542.”
Undoubtedly, the trial judge gave considerable weight to the testimony of Dr. Capozzoli. He found as a matter of fact that the boom had come into contact with the boom-stop. This conclusion is clearly supported by all of the witnesses except Mr. Carbar, the operator, who denied that he had elevated the boom to that extent. He also noted that the bend in the left cord was noticed by Mr. Carbar and Mr. Edmonston. However, the judge a quo has exonerated Mr. Carbar of any negligence and as to this conclusion we must disagree. The bend was called to Mr, Edmonston’s attention at the beginning of the morning and was not considered to pose any danger by either Carbar or Edmonston. The extensive use of the crane for the remainder of the morning and up to the moment of the accident clearly supports the conclusion that the boom was not hazardous. The record is clear that Carbar was an experienced operator and it cannot be presumed that he would have continued its use had he thought the boom was unsafe to do so. Further, every witness who testified expressed the opinion that the boom was not to be raised against the boom stops. Car-bar stated that he never did, that he would always stop just short of doing so. The clear preponderance of the evidence is to the effect that the accident was the result of undue pressure exerted by the boom against the boom stops and that it was not a failure resulting from an attempt to lift an excessive load. Accordingly, we must conclude that the accident was the result of the action of the operator, Mr. Carbar, who unknowingly raised the boom to the *15 breaking point. Assuming that the -bend in the left cord did cause the right cord to come into contact with the right boom stop before the left-hand member, the inevitable fact remains that the boom had to be raised to that extent, contrary to sound and safe' operating procedure, or the accident would not have occurred. For these reasons Mr. Carbar must be deemed at fault.
We concur in the trial judge’s findings that the crane was not defective when leased to Crawford & Russell. The record reflects that it was inspected by AAA Contracting Company, the lessor, and representatives of Crawford & Russell, prior to the latter’s use thereof.
The decision in favor of Bucyrus Erie is also correct. The crane was sold to AAA Contracting Company some seven years previously and was maintained, repaired, and rented by it since the purchase. The record contains no evidence to the effect that any of the materials used in its manufacture were defective or substandard.
We also concur in the judgment relieving Travelers of liability. A representative of Travelers employed as a safety engineer made periodic inspections of Crawford & Russell’s operation. The purpose was to insure as much as possible the adherence by Crawford & Russell to a sound safety practice in its overall project. It was not for the purpose of inspecting the machinery, etc. If the safety engineer noticed an unsafe condition, he called it to the attention of Crawford & Russell’s superintendent, with appropriate suggestions. The acceptance or rejection of any suggestion made by him was left solely to the discretion of Crawford & Russell.
Now turning to the matter of quantum. Plaintiff sustained severe and crippling injuries, including multiple skull fractures, which seriously impair his ability to pursue his occupation as an electrician. It will serve no useful purpose to detail the injuries here because Carbar is incapable, because of his impecunious condition, to remotely respond to a judgment that would adequately compensate plaintiff. He testified that his total net worth at the time of the trial was $5,000.00, that he was a wage earner, with no savings or accumulation of profit. Under these conditions we feel that an award of $5,000.00 is proper.
Accordingly, for the above and foregoing reasons, the judgment of the trial court rejecting the demands of plaintiff against Floyd C. Carbar is reversed and set aside and judgment is rendered herein in favor of the plaintiff Ray A. Smithhart, and against Floyd C. Carbar in the full and true sum of Five Thousand and 00/100 ($5,000.00) Dollars, together with legal interest thereon from the date of judicial demand, until paid. In all other respects, the judgment appealed from is affirmed. The cost of this appeal is to be borne by the defendant, Floyd C. Carbar.
Reversed in part, affirmed in part and rendered.