STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

07-1321 consolidated with 07-1206


MRS. CHERIE BENJAMIN, ET AL.

VERSUS

FIRST HORIZON INS. CO., ET AL.


\*\*\*\*\*\*\*\*\*\*


APPEAL FROM THE
THIRTY-FIRST JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON DAVIS, NO. C-534-87
HONORABLE ANNE LENNAN SIMON, DISTRICT JUDGE


\*\*\*\*\*\*\*\*\*\*


ULYSSES GENE THIBODEAUX
CHIEF JUDGE


\*\*\*\*\*\*\*\*\*\*


Court composed of Ulysses Gene Thibodeaux, Chief Judge, John D. Saunders, and Glenn B. Gremillion, Judges.


                                                        AFFIRMED.


John Allen Jeansonne, Jr.
Scott F. Higgins
Jeansonne & Remondet
P. O. Box 91530
Lafayette, LA 70509-1530
Telephone:  (337) 237-4370
COUNSEL FOR:
        Defendant/Respondent - Bucyrus Erie Manufacturer, Inc., et al.


Dr. Edward A. Robinson, III
600 North Foster Drive
Baton Rouge, LA 70806
Telephone:  (225) 928-7876
COUNSEL FOR:
        Plaintiffs/Applicants - Cherie Benjamin, Leroy Benjamin, Joann
        Benjamin, Lionell Benjamin, Cheryl Holmes, Michael Benjamin,
        and Torence Benjamin

**THIBODEAUX, Chief Judge.**

This case involves a product liability suit filed in 1987 by the family of the deceased, Mr. Leroy Benjamin (the Benjamins), against Bucyrus Erie, the manufacturer of a crane that fell on Mr. Benjamin in 1986, killing him instantly. In 2007 both parties filed motions for summary judgment. Following a hearing on the motions, the trial court denied the motion of the Benjamins and granted the motion of Bucyrus Erie. The Benjamins filed this appeal on the granting of the manufacturer's motion for summary judgment, and the Benjamins filed a writ application, No. 07-1206, on the denial of their own motion for summary judgment. In the interest of judicial economy, we have consolidated the writ application with this appeal. For the reasons set forth below, we affirm the judgments of the trial court.

I.

**ISSUES**

We must decide whether the trial court erred in granting Defendants' Motion for Summary Judgment and in denying Plaintiffs' Motion for Summary Judgment.

II.

**FACTS AND PROCEDURAL HISTORY**

Leroy Benjamin, at age fifty-five, was fatally injured on the job with Merrick Construction in July of 1986 when the boom of a crane fell on him as he walked under it. Prior to the accident, the boom had frozen up and would not move up or down. At the time of the accident, the crane was elevated but not in use. Rather, two crane operators, Victor Lemoine (Lemoine) and Roger Ducote (Ducote), were in the cab troubleshooting the problem with the frozen boom. The employees had been told that the boom was frozen and that the men should not cross under it

while the operators were diagnosing the problem. The men were told that if tools were needed from the supply shed, they should walk behind the crane, not under it. Both operators, Lemoine and Ducote, issued warnings to everyone in the area not to walk under the boom.

The crane had two independent safety locking devices: a brake on the boom hoist drum and a mechanical pawl and ratchet. Either device working alone would have kept the boom from falling. In troubleshooting the frozen boom, wherein the brake was frozen to the drum, the two operators inside the cabin of the crane ultimately disengaged both devices. Ducote was at the lever of the pawl and ratchet trying to boom up and down while Lemoine gradually released the tension on the brake by turning a nut with a wrench. The boom still would not move. Lemoine and Ducote then took the pan off the gear box to check the chain, which was still in tact. While they checked the gear box, the boom fell to the ground. When the boom fell, Mr. Benjamin and Mr. Phillip Ducote, both carpenters at Merrick, were underneath the boom. Phillip Ducote knew that the crane was frozen up and had walked over to talk to supervisors nearby. He thought he was clear of the boom. Mr. Benjamin was walking toward Phillip Ducote and the supervisors and was directly under the boom. Mr. Benjamin was struck and died instantly, and Phillip Ducote was struck and suffered a broken leg and ankle. The supervisors were not injured.

The crane had been purchased new and delivered to Merrick in July of 1961. It had been in use there for twenty-five years and had been associated with no other accidents. Following the accident in 1986, Mr. Benjamin's wife, Mrs. Cherie Benjamin, filed a product liability suit in 1987 against the manufacturer on behalf of herself, the decedent Mr. Benjamin, and their adult children. There were numerous

delays in the litigation. Twenty years later, the parties filed cross motions leading to this appeal and consolidated writ application.

III.

## LAW AND DISCUSSION

### Standard of Review

Appellate courts review motions for summary judgments de novo, asking the same questions the trial court asks to determine whether summary judgment is appropriate. *Champagne v. Ward*, 03-3211 (La. 1/19/05), 893 So.2d 773. This inquiry seeks to determine whether any genuine issue of material fact exists and whether the mover is entitled to judgment as a matter of law. La.Code Civ.P. art. 966 (C)(1). "A fact is material if it potentially insures or precludes recovery, affects a litigant's ultimate success, or determines the outcome of a legal dispute." *Hines v. Garrett,* 04-806, p. 1 (La. 6/25/04), 876 So.2d 764, 765.

A defendant's burden of proof on a motion for summary judgment does not require him to negate all essential elements of the plaintiff's claim, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the plaintiff's claims, actions, or defenses. La.Code Civ.P. art. 966 (C)(2). Thereafter, if the plaintiff fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact. *Id*.

In this case, the 1986 accident is governed by pre-1988 product liability law. The Benjamins cite *Clark v. Jesuit High School*, 96-1307 (La.App. 4 Cir. 12/27/96), 686 So.2d 998, and *Allen v. Traffic Transport Engineering Inc.*, 496 So.2d 1122 (La.App. 4 Cir. 1986), *writs denied*, 501 So.2d 208 (La.1987), which state the plaintiff's burden in a product liability case: to prove that there was a defect in the

3

design or manufacture of the product, that the product was in normal use, that the defect caused an unreasonable risk of harm, and that the plaintiff's injury was caused by the defective product.

The Benjamins further cite *Halphen v. Johns-Manville Sales Corp.*, 484 So.2d 110 (La.1986),[1] regarding design defects. A product may be unreasonably dangerous because of its design for any one of three reasons: (1) A reasonable person would conclude that the danger-in-fact, whether foreseeable or not, outweighs the utility of the product. This is the same danger-utility test applied in determining whether a product is unreasonably dangerous per se; (2) alternative products were available to serve the same needs or desires with less risk of harm; or (3) Although the utility of the product outweighs its danger-in-fact, there was a feasible way to design the product with less harmful consequences. *Id.*

With regard to a design defect, it was not disputed that the crane had been in service with Merrick Construction for twenty-five years without incident and that, at the time of this accident, it was being used to construct a culvert box. Therefore, a reasonable person could not conclude that the danger in using the crane outweighed its utility. Accordingly, the crane was not unreasonably dangerous per se. Further, Benjamin offered no evidence that there was an alternative design that was safer or presented less risk of harm, nor that there was a feasible way to design this product with less harmful consequences. In fact, this crane had two independent safety mechanisms.

More specifically, Bucyrus' expert in mechanical engineering, Dr. Gerald D. Whitehouse, who inspected the crane and its component parts, testified by

---

[1] Some of the principles established in *Halphen* were legislatively overruled by the Louisiana Products Liability Act, Acts 1988, No. 64. The effective date of this act was September 1, 1988 and has no bearing on this case.

deposition that the crane, a Series Two, Model 30-B Crawler, was an all-purpose piece of equipment that could be rigged as a shovel, a dragline, a clamshell, or a lifting crane. It had a lattice boom, meaning that the boom itself looked like lattice work, with steel members in the configuration of X's and V's. The boom was operated by Ducote the day before the accident. Lemoine was the primary operator of the crane. On the day of the accident, it was being used as a lifting crane. Dr. Whitehouse reported that the accident was not caused by the design of the Bucyrus Erie crane, nor by the lack of instructions in the manual. He stated that there were two different locking devices available that would have prevented the boom from falling: the brake on the boom hoist drum and the mechanical pawl and ratchet, which Dr. Whitehouse described as follows:

> The engine powers a set of gears in the gear train, and these gears then are connected to the shafts. . . . The boom is operated by the boom hoist drum. On the boom hoist drum you have a series of wraps of wire rope or cable, in laymen's terms. This cable is wrapped around the drum. The drum has an internal expanding clutch and an external contracting [sic] brake. Now, what this means is that if you want to brake the drum for the boom hoist, then the brake grabs the drum from the outside. If you want to go up or down, the clutch is inside and it goes out and contacts the drum, and then the power then rotates the drum. It either rotates it backwards, which will raise the boom, or it rotates forward, which will lower the boom. That's very simplistic.

> . . . .

> The pawl mechanism is an engagement – we call it a ratchet and pawl. The pawl is the finger that goes into the ratchet. . . . So that the ratchet is a circular member with teeth in it. The pawl is the member that engages the tooth, or teeth. It engages one tooth. So if the pawl is engaged, you cannot lower the boom. It is a mechanical device, and the boom cannot be lowered. Now, if the pawl is engaged you can raise the boom. It'll ratchet. You've probably seen this in a little boat device that pulls your boat up onto the trailer.

. . . .

> The purpose of that is if engaged there is really no way the boom can fall. The device is designed so that for the boom to fall with the pawl engaged you would have to have shearing of the teeth or shearing of the metal pawl itself.

In this case, there was no shearing. In fact, the boom was locked in an elevated position, with the brake frozen to the drum. However, when the operators disengaged both safety locking devices, the boom fell as a result of the operators' action. With regard to alternate designs or safer designs, Dr. Whitehouse further testified that the crane was manufactured and shipped in 1961 and was the state of the art in mechanical technology at that time. He also reported that the instructions in the manufacturer's manual were consistent with industry standards at that time. Dr. Whitehouse stated that he had been involved with the crane industry since the 1960's, that he had particularly watched the evolution of the Bucyrus Erie Series 30B, and that compared with other crane models, the 30B was state of the art and in fact better than a lot of manufacturers' cranes. He described other models which had a "live boom" that could fall. However, with regard to the subject crane, he stated:

> Now, this crane has the control system that if I'm booming up, the clutch is engaged so the drum can boom up. And if I let that handle on that air valve go, just let it go, what's going to happen? It's going to go to the neutral position, and that engages the brake on the boom and the boom stops, so the boom cannot fall. And that was consistent with state of the art technology in 1961.

Dr. Whitehouse further testified that nothing in the maintenance records that he reviewed indicated any major problems with the crane since it had left the manufacturer in 1961. He stated that if the devices provided were properly used, the crane did not create an unreasonable hazard for the safety of the people in the area or for the operator working on the crane. Dr. Whitehouse further testified that if you compared the "1961 model Bucyrus Erie with a BLA Salema-Hamilton crane, which

6

is a similar type, or a Northwest crane, similar type, the instructions and warnings are about the same." He further stated that the Bucyrus Erie crane could be rigged for a forty-five ton capacity, and that the manufacturer of large equipment expects the user to be qualified to operate and maintain such equipment.

Ducote, one of the only two operators who used the crane, and who is still a crane operator with Merrick, testified by deposition in 2007 that the crane was still in service, and that he had no knowledge of Merrick ever sending the crane back to the manufacturer for work on it, or of any representative of the manufacturer ever coming to Merrick to work on the crane. Ducote stated that the crane was put into use following the accident and it had been in use ever since. Accordingly, the Benjamins failed to show that they could carry their burden at a trial on the merits of proving the first element of their case, a design defect, under the criteria stated in their brief.

More specifically, the danger does not outweigh the utility of the crane, which had been operating for over forty-five years at the time of the summary judgment hearing; the crane had state of the art technology in 1961, and there was no alternative or safer design. In fact, the crane's design was safer than that of many being manufactured at the time. Further, there was no evidence that the subject crane could have been re-designed to make it safer. Moreover, counsel for the Benjamins stated at the hearing, in response to the court's question about giving up on the design defect issue, that, "we're not going into the mechanics of the design itself . . . we would concede that."

With regard to the second element stated by the Benjamins, the trial court questioned whether the crane was in "normal use" at the time of the accident. Counsel for Bucyrus Erie pointed out that the crane was not in use at all. In fact, it

was out of use and awaiting repairs, and both Ducote and Lemoine instructed everyone in the area to stay out from under the boom while they diagnosed the problem. Counsel for the Benjamins admitted at the hearing that the crane was not in normal use at the time of the accident:

> Your Honor, if you take what the learned defense counsel says normal use, that's what we are questioning even right there. Your honor, this – this crane was not in the normal use. This crane was not being used at the time. In other words, what I'm saying is that it's not like it was operating.

In spite of this admission at the hearing, the Benjamins argue in brief that the crane was in "normal use" where normal use encompasses not just use precisely in accordance with the manufacturer's instructions. Rather, it includes all reasonably foreseeable uses and misuses of a product. The Benjamins cite *Clark*, 686 So.2d 998, for this proposition. However, in that case a gun manufacturer was found not liable for a student's loss of an eye when another student brought a BB gun to school and knowingly misused it by pointing it at the injured party and pulling the trigger.

The Benjamins point out that questions of normal use usually arise in cases alleging a failure to warn, and they therefore contend that Bucyrus Erie is liable under a failure to warn theory. The Benjamins assert that the defendant should have warned the users of the crane that the boom would fall from an elevated position if both safety measures were disengaged simultaneously. They obtained a one-and-a-half page affidavit from a safety management company to that effect in 1988. They also obtained a more substantive affidavit from mechanical engineer, Dr. Joel Hebert, in 2006, twenty years after the accident, adding that the manufacturer should have warned users not to leave the boom locked in an elevated position. The Benjamins further asserted that Bucyrus Erie should have warned non-users of the dangers of walking under an elevated boom. They assert that warning stickers should have been

8

placed inside of the cabin, outside on the arm of the boom, and in the manual. They further assert that the manufacturer should have provided a warning that yellow tape should be placed around the boom during maintenance. The trial judge found no duty to warn in this case. We agree with the trial judge.

A product may be unreasonably dangerous if the manufacturer fails to provide an adequate warning of any danger inherent in the normal use of its product which is not within the knowledge of or obvious to the ordinary user. *Winterrowd v. Travelers Indem. Co.*, 462 So.2d 639 (La.1985). However, there is no duty on the part of the manufacturer to make a product that is foolproof, and there is no duty to warn where the danger and the manner of avoiding danger is common knowledge and is known by the injured party. *Whitacre v. Halo Optical Prod., Inc.*, 501 So.2d 994 (La.App. 2 Cir. 1987).

In the present case, the danger of walking under an elevated boom is open and obvious. Phillip Ducote testified that he knew better than to stand under an elevated crane, that it was an unwritten rule, and he thought that he was far enough away from it when he stopped to talk to supervisors nearby. As to users of the crane, operators Lemoine and Ducote, both testified that they knew that the boom would fall if both the brake and the pawl were disengaged, and both stated that warnings would have made no difference because they knew what they were doing, trying to free up a frozen boom.

Citing *Smithhart v. AAA Contracting Co.*, 260 So.2d 8 (La.App. 1 Cir.), *writ denied,* 262 So.2d 38 (La.1972), Bucyrus Erie argues that the manufacturer is not liable when intervening actions by employees are the cause of the plaintiff's injuries. There, the plaintiff sued Bucyrus Erie as the manufacturer of a different type of crane, alleging metal fatigue and construction defect in the boom. The court determined that

there was no evidence of substandard materials when the crane left the manufacturer, and that the accident was the result of the action of the operator who unknowingly raised the boom to the breaking point, contrary to sound and safe operating procedure. Likewise, in *Hebert v. Brazzel,* 403 So.2d 1242 (La.1981), the court held that the plaintiffs failed to establish that a valve was defectively manufactured, that the valve stem was probably broken by excessive torque and not due to an internal weakness, and that an ordinary oil field worker would have appreciated the danger involved in greatly multiplying the torque to a valve stem by turning it with a wrench.

In *Frey v. Travelers Ins. Co.,* 271 So.2d 56, (La.App. 4 Cir. 1972), *writ denied,* 273 So.2d 840 (La.1973), the court held that the manufacturer of a crane was under no duty to anticipate and to warn against methods of repairing a crane which would create a defect. There, the manufacturer was not liable for the death of a workman who was working in the basket of a cherry picker when it fell to the ground because of an improper procedure adopted by the employer in repairing the cable and socket of the crane. In *Scott v. Terrebonne Lumber Co.*, 479 So.2d 410 (La.App. 1 Cir. 1985), *writ denied,* 485 So.2d 61 (La.1986), the court found that the manufacturer of lumber was not liable when a worker used knotty number two lumber as scaffolding; the lumber was not in normal use, and misuse by the plaintiff caused his injuries.

We find these cases analogous to the present case. In this tragic accident, the boom did not fall as a result of a defect in the boom during normal use. It fell during troubleshooting efforts by operators who disengaged both safety features on the crane. The manufacturer had no legal duty to warn under the circumstances of this case.

IV.

## **CONCLUSION**

Based upon the foregoing, the trial court's judgment is affirmed. All costs of appeal are assessed to the plaintiffs.

**AFFIRMED**.