479 So.2d 410 (1985)
Irvin SCOTT
v.
TERREBONNE LUMBER COMPANY and United Rent-All, Inc.
No. CA 84 0875.
Court of Appeal of Louisiana, First Circuit.
November 19, 1985.
Rehearing Denied December 26, 1985.
*411 Gordon Hackman, Boutte, for plaintiff-appellant Irvin Scott.
John J. Weigel, New Orleans, for defendants-appellees Hill Behan Lumber Co. and Columbus Lumber Co.
Chris Riviere, Thibodaux, for defendants, R.J. Shaw Const. Co. and United States Fidelity & Guar. Co.
Before CARTER, SAVOIE and ALFORD, JJ.
ALFORD, Judge.
This is an appeal from a judgment denying plaintiff-appellant's recovery for tort damages and worker's compensation benefits. Plaintiff, Irvin Scott, was injured when a board used as scaffolding broke and collapsed underneath him, plunging him to the ground. Scott sought damages in tort from defendants, Terrebonne Lumber Company, United Rent All, Hill-Behan Lumber Company and Columbus Lumber Company. Terrebonne was dismissed prior to trial and United Rent All was dismissed after a directed verdict in its favor. The remaining tort action was consolidated with a worker's compensation action against Scott's employer, R.J. Shaw Construction (Shaw) and its liability insurer, United States Fidelity and Guaranty Company (USF & G).

FACTS
Scott, a 35-year-old man with an eighth grade education, was hired to do the brick *412 phase on the construction of a two story law office in Houma, Louisiana. Scott testified that it was agreed that certain scaffolding and scaffolding boards were to be provided by the general contractor, Shaw. The brick phase was near completion when the accident occurred on December 21, 1977. Scott was standing on a 14' × 10" × 2" board suspended about twenty feet above the ground by scaffolding, when the board broke where a large knot was located, plunging him to the ground. The board, which was purchased by Shaw from Hill-Behan, was marked "No. 2 pine"[1] with the mill stamp of Columbus.
Scott testified that he procured the board from a pile of available lumber (under the carport) about thirty feet from the trash pile at the job site. Nelson Henry, the superintendent for Shaw on the job, testified that the board was taken from the trash pile. The broken board, introduced into evidence, was stained with either mortar or cement. Scott testified that the stains were mortar that he had dropped on the board during the brick-laying. Other witnesses stated that the stains appeared to be cement, indicating that the board had been previously used to frame a slab. The board also contained a nail and nail holes, which the trial judge found corroborated the testimony that the board had been used to frame a slab. Neither Hill-Behan nor Columbus sold scaffolding boards and Leonard Isacks, vice president of Hill-Behan, testified that he had no knowledge that the No. 2 boards were used as scaffolding boards. Scott testified that he regularly used this type of board for scaffolding.
Prior to trial, defendants moved for summary judgment which was granted by the trial judge. This court, on review of the summary judgment, reversed the trial court and held that Scott be given an opportunity to prove that either or both of the respective lumber companies knew that the boards provided by them would be used for scaffolding, that the lumber was defective, and that they knew or should have known of its unsafe conditions. Scott v. Terrebonne Lumber & United Rent-All, Inc., et al., (Docket Number 13,599), (Decision rendered November 10, 1980); Scott v. R.J. Shaw Construction Co. & U.S. Fidelity & Guaranty Co., (Docket Number 13,600), (Decision rendered November 10, 1980).
After trial on the merits, the trial court held that Columbus was not liable as a manufactor and had no duty to warn because the board was not in normal use. Further, it determined that Hill-Behan was not liable because it had no knowledge that the No. 2 pine board purchased by Shaw would be used by anyone for scaffolding. The trial court stated that the sole cause of Scott's accident was his own use of the No. 2 board instead of scaffolding board, which was a misuse of the product. In regard to Scott's workmen's compensation claim, the trial court also held that Scott was not permanently totally disabled.
On appeal, Scott contends that the trial court erred in not finding Columbus and Hill-Behan liable and in not finding him permanently totally disabled. Scott further contends that the trial court erred in not granting a new trial, in failing to assess penalties against USF & G and in failing to apply a presumption against the defendants when they failed to call two witnesses.

TORT LIABILITY
The leading case in Louisiana products liability law is Weber v. Fidelity and Casualty Insurance Company of New York, 259 La. 599, 250 So.2d 754, 755-756 (1971) wherein the court stated:
A manufacturer of a product which involves a risk of injury to the user is liable to any person, whether the purchaser *413 or a third person, who without fault on his part, sustains an injury caused by a defect in the design, composition, or manufacture of the article, if the injury might reasonably have been anticipated. However, the plaintiff claiming injury has the burden of proving that the product was defective, i.e., unreasonably dangerous to normal use, and that the plaintiff's injuries were caused by reason of the defect.
Normal use is not restricted to use for the purpose for which the product was intended, but rather that term extends to all reasonably forseeable uses. LeBouef v. Goodyear Tire and Rubber Co., 623 F.2d 985 (5th Cir.1980). A manufacturer must provide warning of any danger inherent in his product's normal use which is not within the knowledge of an ordinary user. Hebert v. Brazzel, 403 So.2d 1242 (La.1981). It is well established, however, that the duty to warn does not encompass dangers that are or should be obvious to the ordinary user. Winterrowd v. Travelers Indemnity Co., 462 So.2d 639 (La. 1985). In Kent v. Gulf States Utilities, 418 So.2d 493, 497 (La.1982), the court held that in a typical negligence case, "the claimant must prove that something about the thing created an unreasonable risk of injury that resulted in the damage, that the owner knew or should have known of that risk, and that the owner nevertheless failed to render the thing safe or to take adequate steps to prevent the damage caused by the thing ... In a strict liability case against the same owner, the claimant is relieved only of proving that the owner knew or should have known of the risk involved."
The record clearly shows that the board was not in normal use. Shaw and Isacks testified that No. 2 pine is primarily used as structural framing. Shaw further testified that it was customary to use No. 2 boards for forming a slab. The board did have a cement-like substance on it and the presence of a nail and nail holes indicate that it was used as forming material on this job. Isacks testified that No. 2 lumber is on the lower end of the grade scale. The lumber industry produces a special industrial grade board specifically designed for use on scaffolds. Thus, it is not reasonably foreseeable, that a person who is concerned for his safety, would use a No. 2 grade board for support while laying bricks, when the industry produces a much stronger board for that specific purpose.
Scott's contention that Columbus is strictly liable for failing to warn about the dangerousness of the board is without merit. Although a manufacturer may be strictly liable to one injured by its product when the lack of an adequate warning renders that product unreasonably dangerous to normal use, the use of a No. 2 grade board as support while laying bricks cannot be considered as normal. Several witnesses, including Scott, examined the board at trial and noted that there were several knots in the board. Aaron White, Scott's partner and John Scott, Scott's brother who worked for Scott as a laborer, testified that they would not have used the board as a scaffold. These knots were obvious or should have been obvious to an ordinary user. Scott testified that he examined the board before he used it but did not see the knots. Scott was a knowledgeable and sophisticated user. Therefore, there was no duty to warn because the product was not in normal use and the knots were dangers which were obvious to the ordinary user.
Scott contends that Hill-Behan was negligent in the sale of the board. The trial court held that Hill-Behan was not negligent, in that it had no knowledge that the No. 2 pine purchased by Shaw was to be used by anyone for scaffolding. Scott testified that he regularly used this type of board as scaffolding. Isacks testified that he had no knowledge that No. 2 boards were used as scaffolding boards.
It is well settled that the trier of fact actually hearing and observing the witnesses give live testimony is in a better position to evaluate the credibility of the witnesses than a reviewing court on the intermediate level, which at best can only study the written words of a cold record. Kikendall v. American Progressive Ins. Co., 457 *414 So.2d 53 (La.App. 1st Cir.1984). After a careful review of the record, we are convinced that the trial court was not clearly wrong in finding for the defendants. Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978).

DISABILITY
The trial court, in its written reasons for judgment, found that Scott was not permanently totally disabled under LSA-R.S. 23:1221(2)[2]. This article provides that a worker's compensation claimant is considered permanently totally disabled if he is unable to engage in any gainful employment. The Louisiana Supreme Court in Oster v. Wetzel Printing, Inc., 390 So.2d 1318 (La. 1980), held that under the odd lot doctrine, a claimant is permanently totally disabled if he can prove that because of his physical injury and other factors such as mental capacity, education, training or age, he can perform only services which are so limited in quality, dependability or quantity that a stable market for them does not exist. This doctrine has been extended to cases where the claimant can function only with substantial pain. Latin v. Hica Corp., 395 So.2d 690 (La.1981).
Based on the evidence in this case, we conclude that Scott is not permanently totally disabled. However, we do find, by a preponderance of the evidence, that Scott is permanently partially disabled.
Dr. Jerry Haydel was the treating physician on the date of the accident. He treated Scott for a fractured pelvic bone and an injured left wrist. Scott was left handed. Dr. Haydel referred Scott to Dr. Dexter Gary who first saw Scott in June of 1978. At trial, Dr. Gary noted that Scott had pain in his wrist and some limitation in movement. To lessen this limitation in movement, Dr. Gary inserted a nevicular prosthesis on July 21, 1978. Post surgery x-rays on October 11, 1978, were rated "good" and on December 21, 1978, there was only some limitation of wrist motion. In his reasons for judgment, the trial judge stated:
Dr. Gary's conclusions at trial were significant; a) the range of motion and the weak grip were due to the lack of effort on Scott's part to use the wrist over a long period of time; b) a lack of atrophy in the wrist indicated that the patient was using the wrist more than he admitted; and c) the patient's accidental reading of confidential reports sent to his attorney complicated his recovery because it caused misunderstanding on his part which reinforced his belief in his medical problems
Dr. Gary testified that Scott could probably return to work as a bricklayer.
Dr. Russell Grunsten examined Scott on a referral from his attorney, Mr. Hackman, on April 18, 1978. This was Scott's only visit to Dr. Grunsten. He testified in a deposition, entered into evidence, that there was no active nerve compression in the back and found no clinical justification for a lumbar rhizotomy. This is a surgical procedure designed to relieve pain by severing a nerve or nerves in the back. He testified that Scott could return to work as a bricklayer and that he should increase his daily activities.
Scott consulted Dr. Kenneth Vogel, an orthopedic surgeon, on March 1, 1979, complaining of low back and leg pains. Dr. Vogel testified, by way of a deposition entered into evidence, that he diagnosed a positive neurologic finding limited to the lumbosacral region. He performed a lumbo facet rhizotomy on April 22, 1979, and stated that Scott had reached maximum post operative recovery by August 12, 1980. He assigned Scott a five percent impairment of the total body because of the back problem. He was of the opinion that Scott should be restricted to no lifting, pushing, or pulling greater than fifty pounds on a repeated basis, plus no repeated bending.
Scott testified that he tried to return to work as a bricklayer but was unable to *415 continue because of pain. However, he did testify that he planned to return to work as a supervisor. In our opinion, Scott has failed to prove that he is totally disabled.
Although Scott is not permanently totally disabled, he is not precluded from receiving any compensation award at all. Orgeron v. Tri-State Road Boring, Inc., 434 So.2d 65 (La.1983). An employee may be deemed partially disabled if he is unable to perform the same duties in which he was customarily engaged when injured, or duties of the same or similar character for which he is fitted by education, training or experience. LSA-R.S. 23:1221(3).
Scott testified that laying bricks requires him to stoop and bend the entire time he is working. He further testified that he must move his equipment from job to job and that he tried this but was unable to do so after the accident. He must also erect and dismantle metal scaffolds on the job site.
Dr. Vogel treated Scott from March, 1979, to November, 1981. He testified that if bricklaying required repeated bending, that Scott would be unable to do this. He placed the above mentioned restrictions on Scott after performing a lumbar facet rhizotomy and stated that it would be in Scott's best interest if he returned to a field that did not require lifting of more than fifty pounds.
We are of the opinion that Scott's injury will prevent him from performing the same tasks and duties to which he had been accustomed prior to the accident. Since Scott is no longer able to perform such tasks, but is able and willing to perform supervisory tasks, he may be deemed permanently partially disabled.
Scott contends that the accident caused him certain mental problems. The trial court found that Scott failed to prove his mental problems were caused by the accident. We find no abuse of discretion.

PENALTIES AND ATTORNEY'S FEES
Scott contends that USF & G withheld medical payments arbitrarily and capriciously. The trial court held that USF & G was not arbitrary and capricious and therefore not liable for penalties or attorney's fees. A compensation insurer is liable for statutory penalties and attorney's fees when it is arbitrary and capricious in failing to make worker's compensation benefits or medical payments. LSA-R.S. 23:1201.2. This statute is penal in nature and must be strictly construed. Holland v. T.G. & Y. Stores, 451 So.2d 1317 (La.App. 1st Cir.1984). The record does not reflect any evidence that proves that USF & G was arbitrary and capricious in failing to make any medical payments. We therefore find that USF & G was not liable for statutory penalties and attorney's fees.

DENIAL OF A NEW TRIAL
Scott's next contention is that the trial court erred in not granting a new trial. During the time between trial and judgment, Scott was treated by Dr. C.B. Scrignar, his psychiatrist. Scott's attorney obtained a report from Dr. Scrignar and sought a new trial under C.C.P. art. 1972 which mandates a grant of a new trial when the party has discovered evidence since the trial important to the cause that could not have been obtained before or during trial with due diligence.
In the recent case of Collins v. J.C. Penney, Inc., 450 So.2d 1003 (La.App. 1st Cir.1984), this court held that the trial court did not err in refusing to grant a new trial in order that the plaintiff might take a deposition of a doctor who had examined her after trial. This court held that a new trial is not available simply because the doctor has changed his mind or a new medical opinion is sought. Moreover, in Williams v. Liberty Mutual Insurance Co., 327 So.2d 462 (La.App. 3d Cir.1976), the court held that the language in art. 1972 applies to evidence which existed at the time of trial, but which was only discovered after its conclusion. In light of the above jurisprudence, we are of the opinion that the trial judge did not abuse his discretion in not granting a new trial. The doctor's *416 report of Scott's condition did not exist at the time of trial.

FAILURE TO CALL A WITNESS
Finally, Scott contends that defendant's failure to call the supervisor on the job and Warren Mendenhall, the local store manager, at the time of Scott's accident, as witnesses, raises a presumption that their testimony would be unfavorable to defendants. Scott argues that the trial court erred in not applying this presumption.
Such a presumption is available in Louisiana. Morgan v. Matlack, Inc., 366 So.2d 1071 (La.App. 1st Cir. 1979). However, when the witness is available to either side, no inference or presumption will arise from a party's failure to call the witness. Beychok v. Norton, 449 So.2d 32 (La.App. 1st Cir.1984).
Concerning the supervisor of the job, defendants did call Mr. Nelson Henry, the superintendent of the job at the time of Scott's accident. However, defendants did not call Mendenhall. The record reflects that Mendenhall testified in a deposition taken for use at a hearing prior to the trial. Although this deposition was not introduced into evidence at trial, it was available to either party and therefore the presumption does not apply.
Therefore, for the above and foregoing reasons, we reverse the judgment of the trial court in part and affirm in part. We reverse the judgment in favor of United States Fidelity and Guaranty Company and R.J. Shaw Construction Company, which held that Scott was not permanently totally disabled. We find that Scott is partially totally disabled and that benefits be provided to him for his disability under LSA-R.S. 23:1221(3) as of August 12, 1980. The partial disability will run for a maximum of four hundred fifty weeks, at a rate of sixty-six and two-thirds percentum of the difference between the wages the employee was earning at the time of the injury and any lesser wages which the injured employee actually earns or earned in any week, and all medical costs and expenses. Since the injury occurred on December 21, 1977, the average weekly wage is to be determined by the administrator of the Office of Employment Security for the year beginning September 1, 1977, and ending August 31, 1978. The judgment is affirmed in all other respects.
Costs of this appeal are to be apportioned equally between the in forma pauperis fund and the worker's compensation defendants.
AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.
NOTES
[1] Lumber may be graded as No. 1, No. 2, No. 3 or industrial grade for a specific use, with No. 3 being the least desirable in terms of strength. Scaffolding grade lumber is a type of industrial grade lumber and is marked as "scaffolding". Testimony showed scaffolding grade lumber is at the top of the grade scale and is designed for use on a flat plane. Characteristics of scaffolding grade lumber are the density of the wood, the straightness of the grain, and the total absence of knots.
[2] Since the injury occurred in 1977, references in this opinion apply to the Worker's Compensation statutes as they appeared prior to the 1983 amendments, La.Acts. No. 1, Sec. 1.