506 So.2d 1243 (1987)
Carl X. DAVIS
v.
MATERIAL DELIVERY SERVICE, INC., et al. (Two Cases)
Nos. 86 CA 0231, 86 CA 0561.
Court of Appeal of Louisiana, First Circuit.
April 14, 1987.
Rehearing Denied May 29, 1987.
*1244 James C. Klick, Carimi Law Firm, Gretna, for plaintiff/appellant.
William O. Bonin, Landry, Watkins & Bonin, New Iberia, for Dravo Corp., Pelican Div., defendants/appellants.
Katherine M. Loos, Jeansonne, Briney & Goudelocke, Lafayette, for Hartford Acc. & Indem. Co., intervenor.
Andrew Reed, Aycock, Horne & Coleman, Morgan City, for Material Delivery Service, Inc.
Before LOTTINGER, SHORTESS and CARTER, JJ.
CARTER, Judge.
Carl X. Davis (plaintiff), an over-the-road truck driver employed by Sunbelt Transportation Service, Inc. (Sunbelt), sustained third-degree chemical burns after exposure to lime hydrate. Plaintiff filed suit against Material Delivery Service, Inc. (MDS), the owner of the lime tank truck he was driving when injured; George White, MDS's terminal manager; Daniel A. Slay, plaintiff's supervisor at Sunbelt; and Dravo Corporation, Pelican Division (Dravo), manufacturer of the lime which burned him.[1]
After trial on the merits, the jury returned a verdict in favor of plaintiff in the sum of $25,000.00. The jury found that White, MDS, and Dravo were 20%, 40%, *1245 and 30% negligent, respectively, and that plaintiff's contributing negligence was 10%.[2] The jury also found that MDS was not plaintiff's statutory employer and thus MDS and White were not immune from tort liability. Dravo appealed from this judgment. While the first appeal was pending, the trial judge granted a motion by MDS and White for judgment notwithstanding the verdict (JNOV) on the statutory employer issue and dismissed MDS and White from the suit. Plaintiff and Dravo then appealed the judgment which granted the JNOV.
Dravo has appealed, assigning four errors: (1) the jury's finding that Dravo was negligent; (2) the jury's failure to find that plaintiff's negligence was the sole cause of the accident; (3) the granting of the JNOV by the trial judge; and (4) the damage award of $25,000.00, which Dravo contends is excessive. Plaintiff also appealed, joining in Dravo's objection to the JNOV.

FACTS
Dravo, a manufacturer of lime hydrate, operates a bulk lime facility in Amelia, Louisiana. MDS, a common carrier, owns lime tank trucks and maintains a subterminal on property leased from Dravo. MDS employs no truck drivers but contracts with Sunbelt to provide "competent, experienced and duly licensed drivers" as needed.
In July of 1983, plaintiff was hired by Sunbelt. Plaintiff had thirty years' experience as an over-the-road driver but had never hauled lime. Plaintiff testified that he was told he would be trained by being sent on four student or training runs. On July 8, 1983, plaintiff was sent on his first training run with Wayne "Jake" Frehage, Sunbelt's lead driver-trainer. On that run, a "silo job," Frehage taught plaintiff how to load the lime and then unload it into a silo.
Plaintiff's second training run on July 9 was a "spread job" during which the lime was to be blown from the truck. Because the truck would not unload properly, plaintiff testified that he was directed by Frehage to open the valve manually and then to close it manually whenever Frehage stopped the truck. Plaintiff was required to wade through the lime which had been spread to accomplish these maneuvers. Frehage testified that they were both covered with lime, but there was no place for them to wash. Plaintiff testified that the lime irritated him, but the irritation ceased when he went home and bathed.
Plaintiff's next assignment was to take a load of lime to New Iberia on July 13 to spread on a parking lot. He was assigned trailer # 7601, the same one he had used on July 8, but he was given a different tractor because of the broken blower on the tractor he had used previously. When plaintiff started to unload, he could hear noise coming from the blower. Frehage told him to call White because the blower was out. White instructed him to bring the truck to the MDS terminal in Burnside, where he was assigned a new tractor. He then returned to Amelia to load trailer # 7601 for the next day.
On July 14 plaintiff returned to New Iberia and tried to spread his load of lime, but once again the blower on the tractor went out. Plaintiff was alone because the other trucks had already unloaded and left. Plaintiff testified that he called White, who advised him to "belly drop" the load, that is, to open up the doors on the bottom of the trailer which would permit the lime to fall out. In doing so, plaintiff was again covered with lime.
White denied telling plaintiff to belly drop the lime on July 14. He admitted, however, that he was aware that plaintiff had unloaded in that manner because he had approved plaintiff's request for supplemental pay for the extra time required for the belly drop. White also admitted that he did not make any written complaints to plaintiff about the method he used to unload the lime.
Plaintiff returned to Burnside after making the belly drop and reported the problems to the MDS mechanic, who found a broken check valve on trailer # 7601 which was causing the tractor blowers to burn *1246 out. However, the mechanic could not make repairs because he was unable to get a new valve. Plaintiff testified that the mechanic told White and him that the only way trailer # 7601 could be used was for the driver to open the valve manually before starting a "spreading pass" and then to close the valve manually whenever the truck stopped, e.g., before every turn.
Plaintiff testified that by the time he returned to Burnside on July 14, his skin was burning from the exposure to lime. He complained about it to the MDS mechanic, who told him to put hand cleaner on his skin and leave it there. He bathed in epsom salts that night, and the next day he had no visible sign of lime exposure.
Plaintiff's next exposure to lime was on July 18. He was assigned trailer # 7601 to do a spread job in Bayou Vista. The check valve still had not been repaired, so plaintiff was once more forced to open and close the valve manually. After three or four hours' exposure to lime during unloading, he began to develop blisters. Plaintiff testified that he intended to seek medical attention when he finished the Bayou Vista job. When he returned to Amelia he found he had been assigned a silo job in Taft. He showed his burns to the loader at Dravo and told him he could not take the load. The loader told him to talk to Frehage, who advised him to call the Burnside terminal. Plaintiff testified that he was afraid that if he called White and refused to haul the load he would be fired, so he made the silo run that afternoon. Bathing was of no help that night in easing the burning sensation. The next morning he went to the emergency room at Lakewood Hospital. He was treated there for third-degree chemical splash burns on his lower legs.

NEGLIGENCE OF DRAVO
Dravo contends that plaintiff was negligent in exposing himself to lime when he was aware that his skin was becoming more and more irritated with each exposure. Dravo further contends that plaintiff's negligence was the sole cause of his injuries and that the jury erred in finding that Dravo was negligent.
Under a negligence theory of products liability, a plaintiff must prove that the thing which caused damage posed an unreasonable risk of harm to normal use, that the defendant knew or should have known of the risk, and that plaintiff's injury was caused by normal use of the thing. Kent v. Gulf States Utilities Co., 418 So.2d 493 (La.1982). Although a product is not unreasonably dangerous per se, it may still be an unreasonably dangerous product if the manufacturer is required to provide an adequate warning of any danger inherent in the normal use of its product which is not within the knowledge of or obvious to the ordinary user. Halphen v. Johns-Manville Sales Corp., 484 So.2d 110 (La.1986).
It is undisputed that prolonged exposure to lime hydrate can cause severe chemical burns. However, exposure to lime will not cause harm if washed from the skin with a vinegar and water solution. Although lime may not be unreasonably dangerous per se, it became unreasonably dangerous in this case when the manufacturer failed to warn ordinary users of the danger of chemical burns and to inform them of the antidote.
Dravo was well aware of the risk of severe chemical burns but failed to warn the users of its product. Dravo provided its own employees with the vinegar and water solution, warned them of the danger of prolonged lime exposure, and provided protective clothing for its employees who had the most exposure to lime. Edwin Zimlich, administrative manager of the Dravo plant in Amelia, testified that Dravo has never warned anyone other than its own employees about the dangers of lime hydrate and that "[w]e don't normally assume that it is our responsibility to train a truck driver on his job."
Dravo contends it had no duty to warn plaintiff of the danger for three reasons: (1) it assumed that a professional truck driver was aware of the properties of the products he hauled; (2) responsibility for warning plaintiff of the danger rested with MDS and Sunbelt; and (3) plaintiff had gained knowledge of the properties of lime from his three exposures to lime prior to July 21, 1983.
*1247 A manufacturer has no duty to warn of dangers known to the user or obvious to him. Winterrowd v. Travelers Indemnity Co., 462 So.2d 639 (La.1985); Scott v. Terrebonne Lumber Co., 479 So.2d 410 (La. App. 1st Cir.1985), writ denied, 485 So.2d 61 (La.1986). However, plaintiff testified unequivocally that he had no knowledge of either the danger of severe burns or the antidote for lime exposure. The testimony reveals that neither MDS nor Sunbelt had been warned of the danger or possessed this knowledge; thus, plaintiff was not warned by them. Finally, plaintiff's three prior exposures to lime resulted only in irritations; he had no knowledge that thirddegree burns could result.
Plaintiff was an "ordinary user" of bulk lime. He was injured through normal use of that product. Dravo knew of the risk of harm but failed to take any steps to warn.[3] Thus, the jury was not clearly wrong in concluding that Dravo was negligent and that its negligence contributed 30% to plaintiff's injury.

STATUTORY EMPLOYER STATUS OF MDS
Dravo's third assignment of error, in which plaintiff joins, is that the trial court erred in granting a JNOV on the issue of statutory employer status of MDS. Under certain circumstances an owner or principal can be held liable to pay worker's compensation to an employee of a contractor he engages. These circumstances are set forth in LSA-R.S. 23:1061:
Where any person (in this section referred to as principal) undertakes to execute any work, which is a part of his trade, business, or occupation or which he had contracted to perform, and contracts with any person (in this section referred to as contractor) for the execution by or under the contractor of the whole or any part of the work undertaken by the principal, the principal shall be liable to pay to any employee employed in the execution of the work or to his dependent, any compensation under this Chapter which he would have been liable to pay if the employee had been immediately employed by him; ...
However, worker's compensation is the exclusive remedy of the contractor's employee held to be a statutory employee of the principal; the principal is immune from tort liability. LSA-R.S. 23:1032.
"Principal" is defined in § 1032 as "any person who undertakes to execute any work which is a part of his trade, business or occupation in which he was engaged at the time of the injury, or which he had contracted to perform and contracts with any person for the execution thereof." (Emphasis added.) The two essential elements of any statutory employment claim are (1) that the employee be engaged in the trade, business, or occupation of the principal, and (2) that the principal be engaged in that trade, business, or occupation at the time of plaintiff's injury. Berry v. Holston Well Service, Inc., 488 So.2d 934 (La.1986); Lewis v. Exxon Corp., 441 So.2d 192, 197-98 (La.1983).
In the typical case, the court must follow the three-level analysis set forth by the Louisiana Supreme Court in Berry v. Holston to determine whether that statutory employment relationship exists. However, the work of the employee has been held automatically to be within the trade, business, or occupation of the principal in certain "two-contract" situations. Thornton v. Avondale Shipyards, Inc., 479 So.2d 7 (La.App. 5th Cir.1985). The Supreme Court described this two-contract situation in a footnote in Berry:
[A]n owner contracts with a general contractor to do a job. The general contractor in turn contracts with a subcontractor for the "sub" to do the whole or a part of the total job contracted by the "general." Under this contractual relationship, the contract work of the "sub" has been held in decisions of the intermediate courts to be automatically within the trade, business or occupation of the *1248 "general." (citations omitted) 488 So.2d at 936 n. 3.
In this case, the jury found that MDS was not plaintiff's statutory employer and thus MDS was liable to plaintiff in tort. The trial court granted a JNOV on that issue, holding that MDS was plaintiff's statutory employer under the "two-contract" theory.[4] The trial court reasoned that because MDS contracted to load, transport, and deliver lime and "used STS [Sunbelt] as a subcontractor to perform work which was part of MDS's contracts with third parties" it fit into the two-contract scenario.
Although we understand how the trial court could have reached this conclusion, we do not agree that this case properly fits into the two-contract scheme. In footnote three in Berry the court cited seven cases in which a two-contract situation was found. Each case involved a particular general contract and a subsequent subcontract to do a part of the work included in the general contract.[5] In this case Sunbelt and MDS executed a written contract for Sunbelt to provide drivers to MDS as needed to drive vehicles owned or leased by MDS in intrastate and interstate commerce. Dravo then orally contracted for MDS to transport lime manufactured by Dravo each time the need arose. However, there was no particular general contract between MDS and Dravo to perform specific work at the time MDS "subcontracted" with Sunbelt. Thus, these contracts do not fit the temporal requirements of the two-contract case, i.e., that the principal must first contract to do work and then contract for the "sub" to do all or part of the work.[6]
The purpose of LSA-R.S. 23:1061 is to subject a principal to compensation liability when he attempts to "avoid his compensation obligation by farming out part of his own normal obligations to a contractor." 13 W. Malone & H. Johnson, Louisiana Civil Law Treatise, Worker's Compensation Law and Practice, § 126, at 262 (2d ed. 1980). In the last four years the Louisiana Supreme Court has shifted from a liberal application of the statutory employment defense to a restrictive approach more in keeping with this purpose. See Berry, 488 So.2d at 937; Lewis v. Exxon Corp., 441 So.2d 192. MDS did not attempt to avoid its compensation obligation in this case; Sunbelt was required to provide worker's compensation coverage to its employees under its contract with MDS. A liberal interpretation of the twocontract defense herein would run counter to the Supreme Court's directive in recent cases to restrictively apply the statutory employment doctrine.
For these reasons we conclude that this case does not fall into the two-contract situation. Furthermore, applying the Berry analysis to the facts herein, it is clear that plaintiff was not engaged in the trade, business, or occupation of MDS at the time of his injury because plaintiff's work as an over-the-road truck driver operating a lime tank truck was specialized per se, that is, it required a degree of skill, training, and experience not normally possessed by those outside that field.[7] We find that the jury was properly charged as to the statutory employer defense and was not clearly wrong in finding that MDS was not a statutory employer. The trial court erred in granting a JNOV on that issue; the JNOV had the effect of dismissing both MDS, *1249 which had been assigned 40% of the fault, and White, who was assigned 20% of the fault.

QUANTUM
The final assignment of error by Dravo is that the lump sum damage award of $25,000.00 is excessive. Plaintiff was treated by Dr. Walter Daniels, a family practitioner, in the emergency room at Lakewood Hospital on July 22, 1983, for third-degree chemical splash burns on both lower legs. His legs were cleaned and an antibiotic cream was applied. He was given prescriptions for penicillin to prevent infection and a codeine compound for pain, and a tetanus shot. Plaintiff's burns were healing well when he saw Dr. Daniels at his office on July 25 and July 28. He saw Dr. Daniels weekly from August 4 through September 1, when he was discharged because all of his burns had healed.
In addition to his burns, plaintiff attempted to connect certain problems with his ears to the accident. Plaintiff was treated by Dr. Robert H. Cox, an ear, nose, and throat specialist at Ochsner Clinic in New Orleans, beginning in October of 1983 for a cholesteatoma of the left ear. Plaintiff told Dr. Cox that he had been in an explosion of lime, noticed bleeding from his ear, and had not been able to hear since that time. Based on this history, which plaintiff admitted at trial was incorrect, Dr. Cox testified that it was possible plaintiff had sustained a recent puncture of the eardrum which resulted in the cholesteatoma.
Plaintiff did not complain of ear pain to Dr. Daniels until August 11. Dr. Daniels' notes showed that on that date plaintiff told him he had noticed bleeding from his ear after his wife inserted a cotton swab in his ear to clean it. Dr. Daniels testified that the eardrum was bruised but showed no sign of bleeding. Dr. Cox testified that a non-specialist might mistake a healing perforated eardrum for a bruised eardrum, but if plaintiff did not complain of ear pain or bleeding prior to August 11 it would suggest that plaintiff's eardrum had not been punctured.
Plaintiff was also treated by Dr. Cox for an abnormal stapes bone which affected his hearing. However, Dr. Cox stated that the problem with the stapes bone could not be connected with the cholesteatoma, and thus could not be connected to the lime exposure. Dr. Daniels testified that plaintiff did not complain of hearing loss to him until September 26, when he was treated for problems unrelated to lime exposure, and that in his opinion none of plaintiff's ear problems were related to lime exposure.
Plaintiff's medical expenses for treatment of the lime burns on his legs were $182.25. Plaintiff was disabled from working from July 21, 1983, to September 1, 1983, a total of six weeks, and lost wages of approximately $1,464.00. Thus, plaintiff's special damages related to the lime burns totaled $1,646.25.[8]
Our initial inquiry, under the standard set forth in Reck v. Stevens, 373 So.2d 498 (La.1979), is whether the jury's award of $23,353.75 in general damages for this plaintiff's particular injuries and their effects upon him is a clear abuse of the jury's much discretion. We conclude that an award of in excess of $23,000.00 for third-degree chemical burns requiring outpatient treatment which healed in six weeks with no residual damage other than scarring on plaintiff's lower legs was not an abuse of the jury's much discretion.
For the foregoing reasons, the judgment of the trial court is reversed as to the dismissal of George White and MDS by granting the JNOV, and in all other respects is affirmed. Costs of this appeal are taxed to MDS and White.
REVERSED IN PART, AFFIRMED IN PART, AND RENDERED.
SHORTESS, J., dissents in part. I agree with this opinion except for the word "not" in the penultimate paragraph.
NOTES
[1] Plaintiff died after trial from causes unrelated to this lawsuit. His widow, Donna Davis, has been properly substituted as plaintiff-appellee appellant.
[2] Slay was voluntarily dismissed by plaintiff prior to trial.
[3] Such a warning could have been given quite easily. George White testified that bulk cement companies print notices on their bills of lading warning of the dangers of exposure and advising of measures to take in case of contact.
[4] The jury was instructed on the two essential elements of a statutory employment status claim but was not instructed on the two-contract theory.
[5] Six of those cases were construction contracts, the classic two-contract scenario.
[6] The facts of this case are very similar to those in Holmes v. St. Charles General Hospital, 465 So.2d 117 (La.App. 4th Cir.1985), in which a separate corporation employed lab technicians who performed all of the lab work for a hospital. The court held that even though hospitals normally employ their own lab technicians, in this case the hospital was not plaintiff's statutory employer because the work being performed by plaintiff was not within the trade, business, or occupation of the hospital. The Supreme Court stated that this result was correct in Berry v. Holston Well Service, Inc., 488 So.2d 934, 939 n. 4.
[7] The trial judge conceded in his reasons for judgment that MDS could qualify as a statutory employer only under the two-contract theory.
[8] The worker's compensation intervenor recovered judgment for $1,405.97 of that amount.